**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 23, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ROBERT BARNES,

      Plaintiff - Appellee,

v.

SECURITY LIFE OF DENVER
INSURANCE COMPANY,

      Defendant - Amicus Curiae.

------------------------------

JACKSON NATIONAL LIFE
INSURANCE COMPANY,

      Movant - Appellant.

No. 18-1487

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:18-CV-00718-WJM-SKC)**
_____

Waldemar J. Pflepsen, Jr. (Shaunda Patterson-Strachan, with him on the briefs), Drinker Biddle & Reath, LLP, Washington, DC, appearing for Appellant.

J. Toji Calabro, Stueve Siegel Hanson, LLP, Kansas City, Missouri (Daniel C. Girard, Jordan Elias, and Elizabeth A. Kramer, Girard Sharp, LLP, San Francisco, California; Norman E. Siegel, Stueve Siegel Hanson, LLP, Kansas City, Missouri; and John J. Schirger and Matthew W. Lytle, Miller Schirger, LLC, Kansas City, Missouri, with him on the brief), appearing for Appellee.

Kathryn A. Reilly and Chuan (Cici) Cheng, Wheeler Trigg O'Donnell LLP, Denver, Colorado; Clark C. Johnson and Michael T. Leigh, Kaplan Johnson Abate & Bird LLP, Louisville, Kentucky, for amicus curiae Security Life Insurance Company.

_____

Before **BRISCOE**, **EBEL**, and **HARTZ**, Circuit Judges.

_____

**BRISCOE**, Circuit Judge.

_____

Plaintiff Robert Barnes filed this putative class action against defendant Security Life of Denver Insurance Company (SLD) alleging that SLD, in the course of administering life insurance policies purchased by Barnes and other similarly-situated class members, breached its contractual duties and committed the tort of conversion by imposing certain administrative costs that were not authorized under the terms of the policies. Jackson National Life Insurance Company (Jackson) moved to intervene, asserting that, as a result of reinsurance agreements entered into by SLD, Jackson was actually the entity responsible for administering Barnes's policy and numerous other policies listed within the putative class. The district court denied Jackson's motion. Jackson now appeals.

We have jurisdiction over Jackson's appeal pursuant to 28 U.S.C. § 1291 "[b]ecause an order denying intervention is final and subject to immediate review if it prevents the applicant from becoming a party to an action . . . ." WildEarth Guardians v. United States Forest Serv., 573 F.3d 992, 994 (10th Cir. 2009) (quotations and brackets omitted). After reviewing the parties' briefs and the record on appeal, we conclude that Jackson has established the requirements for intervention as of right, and accordingly reverse the decision of the district court and remand with directions to grant Jackson's motion to intervene.

Plaintiff Barnes is a citizen of the State of North Carolina. Defendant SLD is a corporation incorporated under the laws of the State of Colorado, with its principal place of business in Denver, Colorado.

In 1984, Barnes, who was then 29 years of age, purchased from Southland Life Insurance Company (Southland) a "Flexible Premium Adjustable Life Insurance Policy" (the Policy), Policy Number 851502124, with an effective date of May 20, 1984, and an initial specified amount of $50,000. Aplt. App., Vol. 1 at 13, 32. In addition to a death benefit, the Policy provides Barnes with "an investment, savings, or interest-bearing component that accumulates value over time ('the Cash Value')." Id. at 14. When Barnes receives an account statement, this component is referred to as "Accumulated Value." Id.

The Cash Value on the date the Policy was issued was equal to the amount of the initial net premium. Thereafter, the Cash Value for any given month was, and continues to be, "calculated by: (a) adding a percentage of each monthly premium received to the prior month's Cash Value; (b) subtracting from that amount the amounts of any charges assessed and deducted by [SLD]; and (c) adding to that total one month's interest earned on the difference between the prior month's Cash Value minus the current month's charges assessed and deducted by [SLD]." Id. at 15.

The Policy states that the insurer "may assess and deduct only those charges allowed by the Policy," and it in turn "expressly defines the specific charges that [the insurer] may assess and deduct from the Policy's Cash Value." Id. The permissible

deductible costs under the Policy include "the cost of insurance for the policy month," "the sum of the monthly expense charges," and "the cost of any supplemental benefits provided by rider." Id. at 16. Under the terms of the Policy, "[t]he cost of insurance rate is based on the sex, attained age, and rate classification of the Insured." Id. at 17.

On July 1, 2002, Southland entered into an indemnity reinsurance agreement with the Life Insurance Company of Georgia (LOG). Under the terms of that agreement, Southland ceded and transferred certain liabilities arising under a group of its life insurance policies (the Transferred Policies), including Barnes's Policy, to LOG as reinsurer. On that same date, Southland and LOG also entered into an Administrative Services Agreement covering the Transferred Policies. Together, these agreements required LOG to assume certain administrative duties on behalf of Southland, including determining the cost of insurance rates and other administrative charges. LOG also expressly assumed liability arising out of or relating to the manner in which LOG set those rates and charges.

In 2004, Southland merged into Security Life of Denver Insurance Company (SLD). As a result of this merger, SLD became the effective and liable insurer of the Policy. But LOG continued to reinsure and administer the Policy and all of the other Transferred Policies.

On May 25, 2005, SLD and LOG entered into an Amended and Restated Administrative Services Agreement. Under the terms of that amended agreement,

4

LOG's authorization to perform certain administrative functions relevant to the Transferred Policies continued.

In 2005, Jackson acquired LOG and assumed the administration of the Transferred Policies, including the authority to set non-guaranteed elements, such as the cost of insurance.

On December 22, 2010, SLD and Jackson entered into an Amended and Restated Indemnity Reinsurance Agreement. The purpose of that agreement was, in part, "to make certain changes to the Original Agreement to reflect the results of [the] mergers." Id. at 102. A year later, on December 22, 2011, SLD and Jackson entered into a Second Amended and Restated Indemnity Reinsurance Agreement in order to make certain changes mandated by New York state insurance laws. These agreements expressly continued Jackson's authority to administer the Transferred Policies. Id. at 235 ("the Company [SLD] continues to desire that the Reinsurer [Jackson] perform certain administrative functions on behalf of the Company with respect to the Policies in accordance with the terms of the Administrative Services Agreement entered into by Southland and LOG").

Thus, for many years now, SLD and Jackson have independently administered separate groups of life insurance policies that were originally issued by SLD. There is no indication "that SLD and Jackson made the same subjective, discretionary decisions with respect to policy administration, or that such decisions were supported by identical reasoning and analysis." SLD Br. at 3.

5

II

On March 27, 2018, Barnes initiated this action by filing a complaint against SLD in the United States District Court for the District of Colorado. The complaint asserted subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).

Section I of the complaint, titled "NATURE OF ACTION," stated, in pertinent part: "This is a class action for breach of contract and conversion to recover amounts that [SLD] charged Plaintiff and the proposed class in excess of the amounts authorized by the express terms of their life insurance policies." Id. at 11. Section I further stated that "[t]he terms of Plaintiff's life insurance policy provide for a 'Cash Value' consisting of monies held in trust by [SLD] for Plaintiff, and [SLD] is contractually bound to deduct from the Cash Value only those charges that are explicitly identified and authorized by the policy's terms," yet, "[d]espite unambiguous language in the policy, . . . [SLD] breaches the policy by deducting charges from Plaintiff's Cash Value in amounts exceeding those specifically permitted by the policy, and those breaches are continuous and ongoing." Id. at 12. More specifically, the complaint alleged that, although SLD was authorized under the Policy "to use only its 'expectations as to future mortality experience' when determining Cost of Insurance Rates," SLD actually "used other factors not authorized by the Policy when determining such rates, including without limitation: expense experience, persistency, taxes, profit assumptions, investment earnings, capital and reserve requirement, and other unspecified factors." Id. at 18.

The complaint identified the class as

6

[a]ll persons who own or owned a life insurance policy issued or administered by [SLD], or its predecessors in interest, the terms of which provide or provided for: 1) an insurance or cost of insurance charge or deduction calculated using a rate that is determined based on [SLD]'s expectations as to future mortality experience; 2) additional but separate policy charges, deductions, or expenses; 3) an investment, interest-bearing, or savings component; and 4) a death benefit.

Id. at 20.

Counts I through III of the complaint asserted distinct breach of contract claims. Count I alleged, in pertinent part, that, "[b]y including unauthorized and undisclosed factors in the monthly Cost of Insurance Rates, [SLD] deducts amounts in excess of those contractually authorized under the terms of the [p]olicies" owned by the class members. Id. at 23. Count II alleged, in pertinent part, that, "[b]y including unauthorized expense factors in monthly Cost of Insurance Rates, [SLD] impermissibly deducts expense charges from the Cash Values of Plaintiff and the class in amounts in excess of the fixed and maximum expense charges expressly authorized by their policies." Id. at 24. Count III alleged, in pertinent part, that SLD's "failure to lower" the monthly Cost of Insurance Rates for the policies owned by the class members, "even though its expectations of future mortality experience improved[,] constitutes a breach of the [p]olicies." Id.

Count IV of the complaint asserted a claim for conversion. Id. at 25. It alleged that "Plaintiff and the class had a property interest in the funds [SLD] deducted from the Cash Values in excess of the amounts permitted by the terms of the Policies" and that, "[b]y deducting Cost of Insurance charges and expense charges in unauthorized amounts from the Cash Values of Plaintiff and the class,

7

[SLD] assumed and exercised ownership over, and misappropriated or misapplied, specific funds held in trust for the benefit of Plaintiff and the class, without authorization or consent and in hostility to the rights of Plaintiff and class members." Id. Lastly, Count V of the complaint asserted a claim for declaratory and injunctive relief.

On August 1, 2018, Jackson filed a motion for leave to intervene in the proceedings. Jackson argued that it should be allowed to intervene as of right because it has an interest related to the property or transaction that is the subject of plaintiff's action. Jackson explained that, "as the entity that currently administers and reinsures the [plaintiff's] Policy, [it] has a direct, substantial, and legally protectable interest in defending the manner in which the Policy has been administered by it." Id. at 69. In other words, Jackson stated that, "[a]s administrator, [it] has responsibility for certain administrative functions, including the authority to set the [cost of insurance] rates and other charges at issue" in this lawsuit. Id. at 69–70. Jackson in turn asserted that its interest might be impaired or impeded if intervention was not permitted. Jackson noted, for example, that the complaint effectively "challenges *current* activities and decision making by Jackson and seeks declaratory and injunctive relief that seek to mandate that Jackson make material changes to its administrative practices, specifically, its administration and management of the relevant policies, including the ongoing determination of the policy rates and charges at issue." Id. at 70 (emphasis in original). Jackson noted that "[f]or Plaintiff to obtain this prospective relief would require Jackson to stop

8

collecting charges and expenses in the amounts *it* determines are contractually permissible, because Jackson is the entity *currently* responsible for administering the [plaintiff's] Policy." Id. at 71 (emphasis in original). Jackson argued that it "would [also] be ultimately responsible for damages awarded to Plaintiff and the putative class for the past amounts [it] collected . . . ." Id. Lastly, Jackson argued that SLD could not adequately represent Jackson's interest. Jackson emphasized that there were "two groups of policies implicated here [by the complaint's class definition]— those Jackson administered and those it did not," and it noted that, as a result of this, "the manner in which the charges and expenses at issue have been administered for the two groups of policies . . . would have varied, and likely significantly so as different entities were independently responsible for the actions alleged in the Complaint . . . ." Id. Thus, Jackson argued, "there is a distinct possibility that [its] and SLD's interests and defense strategies may diverge in this litigation." Id.

Jackson also argued that it met the requirements for permissive intervention. Jackson noted that it sought "to intervene to defend its conduct with regard to the administration of the reinsured policies" and that its "defense [wa]s central to the essence of this case, which will turn on questions about how Jackson (or LOG before it) administered the Policy and whether those acts constitute a breach of the Policy terms." Id. at 72. Jackson further argued that its "presence in this case w[ould] add value to this litigation" because it "holds documents and controls witnesses that bear on the administration of the rates and charges for Plaintiff's Policy and other Jackson-administered Southland policies challenged in this litigation." Id. at 73.

Barnes opposed Jackson's motion for leave to intervene. From a factual perspective, Barnes asserted that he "never entered into a contract with Jackson," and that "SLD remain[ed] the insurer obligated to pay any insurance claims arising under his policy." Id. at 107–08. Barnes also asserted that the reinsurance agreement afforded Jackson "the right to 'assume the defense and control' of the litigation," as well as the right to approve any settlement entered into between SLD and Barnes. Id. at 111. In addition, Barnes noted that the reinsurance agreement required "Jackson . . . to cooperate with any litigation against SLD relating to the policies subject to the reinsurance agreement, including by producing documents and witnesses for deposition." Id.

As for his legal arguments, Barnes argued that Jackson's "interest, if any, relate[d] only to a subset of policies within the putative class period, and only for a portion of the time relevant here." Id. at 112. Barnes argued that he "should not be required to litigate separately against Jackson . . . when Jackson . . . can direct the defense of [his] claims and its interests in avoiding liability under the form policy language are derivative of—and thus adequately represented by—SLD." Id. In terms of Jackson's purported interest in the action, Barnes argued that Jackson's "assumption of liability would give it an *indirect* derivative interest, at most, in the outcome of [his] claims." Id. at 113. Barnes also argued that Jackson's "objectives in this litigation would be no different from SLD's" because "[b]oth entities . . . [we]re interested in successfully defending Plaintiff's claim of breach of a form contract, and hence in obtaining a ruling that the policy's provisions permitted SLD

10

(whether acting through Jackson . . . or otherwise) to make the deductions it did." Id. at 117.

On October 29, 2018, Jackson filed a motion for leave to file a supplemental brief in support of its motion for leave to intervene. Jackson noted in its motion for leave "that recent [factual] developments in the litigation," specifically a September 18, 2018 "Discovery Hearing" before the magistrate judge, "further confirm[ed] that intervention . . . [wa]s appropriate." Id. at 314. Those "discovery developments," Jackson asserted, "reveal[ed] that . . . Jackson, not having been served with either party or non-party discovery, nevertheless [wa]s placed in an untenable position of being without an appropriate forum in which to fully protect its interest as the current parties proceed[ed] to make discovery demands on it." Id. at 315. "For example," Jackson noted, it "lack[ed] appropriate standing under the Federal Rules of Civil Procedure" to dispute the parties' "contract interpretation" regarding Jackson's discovery obligations. Id.

On November 21, 2018, the district court issued a written order denying Jackson's motion to intervene and denying as moot Jackson's motion to supplement. At the outset of its order, the district court recounted the relevant factual history and noted, in pertinent part, that "[i]n 2005, Jackson acquired LOG and assumed responsibility for the administration and reinsurance of the Barnes Policy and others." Id. at 362. The district court in turn concluded that "[t]he administrative services and reinsurance agreement" that Jackson inherited from LOG "address[ed] SLD and Jackson's rights and obligations when faced with litigation over the

11

Jackson-administered policies." Id. The district court proceeded to describe those rights and obligations. "Generally," the district court noted, "Jackson 'shall sue or defend, at its own expense and in the name of [SLD] when necessary . . . any action brought upon a Policy.'" Id. (quoting ECF No. 42-5 at 14, § 2.3(c)). "However, SLD retains 'the exclusive right to exercise control of and direction over any claim or litigation involving Retained Liabilities.'" Id. "When SLD makes a timely notice of a third-party claim, Jackson may 'assume the defense and control' of the litigation and may, under certain circumstances, settle litigation without the consent of SLD." Id. at 362–363 (quoting ECF No. 42-6 at 42, § 1). "Importantly, however, SLD cannot settle litigation without Jackson's prior written consent," and "[i]f Jackson exercises its right to assume defense and control of the claim, SLD has the right (but not the obligation) to reasonably participate in (but not control) the defense of claims with its own counsel and at its own expense." Id. at 363.

The district court in turn noted that "[o]n April 26, 2018, SLD sent a notice of claim to Jackson informing Jackson of Barnes' claim implicating life insurance policies for which Jackson had assumed responsibility." Id. The district court further noted that, "[o]n May 7, 2018, Jackson responded to SLD's letter acknowledging its responsibility to indemnify SLD with respect to the Barnes Policy." Id.

The district court then proceeded to analyze Jackson's request to intervene as of right, concluding that "Jackson . . . fail[ed] to establish inadequate representation, thus foreclosing intervention as of right." Id. at 366. The district court explained

12

that "[t]wo facts persuade[d] [it] that Jackson's interests [we]re already adequately protected by SLD." Id. at 367. "First," the district court stated, "Jackson and SLD have identical interests in the litigation: defending the cost of insurance coverage, as well as the administration of the subject policies, including the Barnes Policy, from 1984 to present." Id. Second, the district court noted that "Jackson ha[d] failed to show that its interests would be inadequately represented [by SLD] absent intervention," and that, in fact, "Jackson has a contractual *right* to control this litigation." Id. at 368 (emphasis in original). Although the district court acknowledged "Jackson['s] conten[tion] that SLD ha[d] prevented it from exercising its contractual right to direct and control the litigation," the district court concluded that Jackson's remedy was to "assert a separate breach of contract claim in an independent action against SLD," or to "possibly assert breach of contract as a defense if SLD [wa]s ultimately held liable in this litigation." Id.

As for Jackson's request for permissive intervention, the district court concluded "that Jackson ha[d] not shown that permissive intervention would contribute to the just resolution of this lawsuit." Id. The district court acknowledged that "Jackson's control of documents and witnesses [wa]s admittedly complicated by its ambiguous status (neither third party nor defendant)." Id. "However," the district court stated, "Jackson ha[d] not adequately addressed why party status [wa]s preferable for the purposes of discovery, particularly in light of the availability to Barnes of the issuance of third-party subpoenas, as well as Jackson's contractual

13

obligations during litigation under the reinsurance and administrative service contracts." Id.

On December 20, 2018, Jackson filed a notice of appeal from the district court's order denying its motion to intervene.

## III

Jackson argues on appeal that the district court erred in holding that Jackson failed to satisfy the requirements for intervention as of right, and also abused its discretion in holding that Jackson failed to satisfy the requirements for permissive intervention. For the reasons that follow, we agree that the district court erred in denying Jackson's motion to intervene as of right. Consequently, we need not address Jackson's permissive intervention arguments.

*Intervention as of right – requirements and standard of review*

Intervention as of right is governed by Federal Rule of Civil Procedure 24(a)(2), which states:

> On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2). We have construed the plain language of this rule to mean that "a nonparty seeking to intervene as of right must establish (1) timeliness, (2) an interest relating to the property or transaction that is the subject of the action, (3) the potential impairment of that interest, and (4) inadequate representation by existing parties." Kane Cty. v. United States, 928 F.3d 877, 889 (10th Cir. 2019).

14

Notably, we "follow[] a somewhat liberal line in allowing intervention." Utah Ass'n of Counties v. Clinton, 255 F.3d 1246, 1249 (10th Cir. 2001) (quotations omitted). "The central concern in deciding whether intervention is proper is the practical effect of the litigation on the applicant for intervention." San Juan Cty. v. United States, 503 F.3d 1163, 1193 (10th Cir. 2007) (en banc).

"We review a district court's timeliness ruling for an abuse of discretion, unless the district court makes no findings on timeliness; in that case, we review de novo." Kane Cty., 92 F.3d at 889. We review de novo the district court's rulings on the remaining three requirements. Id.

*Analysis of Jackson's motion to intervene as of right*

Because it is undisputed that Jackson's motion to intervene was timely, we focus our analysis on the remaining three requirements for intervention as of right and apply de novo review.

A. *Barnes's interest in the subject of the action*

"Whether an applicant has an interest sufficient to warrant intervention as a matter of right is a highly fact-specific determination, and the interest test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." Id. (citations and quotations omitted). Coal. of Ariz./N.M. Ctys. for Stable Econ. Growth v. Dep't of Interior, 100 F.3d 837, 840 (10th Cir. 1996). We "require that the interest in the proceedings be direct, substantial, and legally protectable." Id. (quotations and brackets omitted). "A protectable interest is one that would be impeded by the

15

disposition of the action." W. Energy All. v. Zinke, 877 F.3d 1157, 1165 (10th Cir. 2017) (quotations omitted).

Jackson makes a number of compelling arguments for why its interest in this proceeding satisfies these requirements. To begin with, Jackson notes that "the subject of the underlying action is the Barnes Policy," and Jackson in turn asserts that, "as the entity that currently administers (and reinsures)" the Barnes Policy, it "has a direct, substantial, and legally protectable interest in defending the manner in which the Policy has been administered by it." Aplt. Br. at 17. "More specifically," Jackson argues that, "as administrator, [it] has contractual responsibility for certain administrative functions, including the authority to set the [cost of insurance] rates and other charges — *the principal activity challenged here*." Id. at 18 (emphasis in original). Further, Jackson asserts, "[a]s the 100% indemnity reinsurer, [it] also has the responsibility for any covered liabilities that arise under or relate to the Barnes Policy, including its administration, and thereby may ultimately be liable to SLD for any nonmonetary judgment imposed against SLD for the reinsured policies, including the Barnes Policy." Id. Lastly, Jackson notes that the declaratory and injunctive relief sought by Barnes, if granted, would effectively "compel Jackson *prospectively* to make material changes to *its* administrative practices."[1] Id. (emphasis in original).

---

[1] As SLD itself notes in its appellate brief, "[a]n order entered in an action Jackson was not named to and was not allowed to join would at a minimum raise serious questions about its enforceability—and very likely would be ineffective—as to the Jackson block" of policies. SLD Br. at 2 n.2. Notably, the dissent wholly ignores Barnes's request for prospective injunctive relief. Further, the dissent concludes, incorrectly, that "Jackson's only interest in the Barnes litigation is in its

16

Barnes argues, in response, that the interests identified by Jackson are not direct interests, but rather interests that "are derivative of SLD's." Aple. Br. at 15. In support, Barnes asserts that, under the terms of the Amended and Restated Administrative Services Agreement entered into between SLD and LOG and assumed by Jackson, "Jackson makes 'recommendations' regarding all 'Non-Guaranteed Elements of the Policies' such as the cost of insurance rates, and SLD has the right to reject those recommendations." Id. at 15–16. But Barnes misreads the terms of the Amended and Restated Administrative Services Agreement in making this argument. That agreement gave Jackson, in pertinent part, the responsibility of "(i) making recommendations to, and consulting with, [SLD] with respect to the reserving methodology related to the Policies . . . and (ii) the establishment and variance of all Non-Guaranteed Elements of the Policies," including the cost of insurance rates. Aplt. App., Vol. I at 208. The phrase "making recommendations" modified only the duties outlined in subsection (i), and not the duties outlined in subsection (ii). Subsection (ii) quite clearly gave Jackson the responsibility of "establishing" and "varying" cost of insurance rates, and not just making recommendations about those rates to SLD. Thus, the allegations in Barnes's complaint quite clearly implicate, with respect to the Transferred Policies, a duty that SLD and Jackson expressly agreed to allocate exclusively to Jackson, and that Jackson and its predecessor LOG

capacity as an indemnitor of SLD." Dissent at 9. As noted, Jackson's role as administrator of the Transferred Policies gives it a significant interest in the outcome of this case.

17

have been carrying out since 2002. See SLD Br. at 1 ("[F]or most of this century, Jackson has made all challenged decisions with respect to Barnes's policy.").

Barnes also argues that Jackson's "indemnity obligation is a derivative interest too." Aple. Br. at 16. More specifically, Barnes argues that "SLD is the effective and liable insurer of the putative class Policies," and Jackson's financial responsibility "is to SLD—not Barnes—and arises out of SLD's indemnification claim." Id. (quotations and brackets omitted). Again, however, Barnes misreads or misrepresents the relevant facts. To be sure, under the terms of the Second Amended and Restated Indemnity Reinsurance Agreement, Jackson acts as the indemnity reinsurer for all of the Transferred Policies, including Barnes's Policy, and thus effectively indemnifies SLD for any "gross liabilities and obligations arising under or relating to" the Transferred Policies. Aplt. App., Vol. I at 237, 241. That indemnity reinsurance obligation does not extend, however, to "extra contractual obligations" relating to the policies, including "consequential, exemplary or other form[s] of extra-contractual damages, which liabilities or obligations arise from any act, error or omission . . . relating to . . . administration of the Policies." Id. at 237. Instead, under the terms of the Second Amended and Restated Indemnity Reinsurance Agreement, Jackson "agree[d] to assume and discharge one hundred percent (100%) of all Extra Contractual Obligations," and thus bears the sole "responsibility for paying or otherwise discharging, as and when due, all Extra Contractual Obligations." Id. at 242. Thus, it appears that Jackson, and not SLD, will bear the responsibility for paying any liability arising out of the misadministration of the

18

Transferred Policies. Further, even assuming, for purposes of argument, that the Second Amended and Restated Indemnity Reinsurance Agreement did obligate Jackson to reimburse SLD for any liability imposed in this action, it is clear that Jackson has a financial interest in the proceeding that is sufficient to satisfy the minimal burden we have imposed for intervention as of right.

For these reasons, we conclude that Jackson has established an interest in this action that is direct, substantial, and legally protectable for the purposes of intervention under Rule 24(a)(2). Further and relatedly, we conclude that Jackson has established that its participation in this action would be "compatible with efficiency and due process."[2] Coal. of Ariz., 100 F.3d at 841.

*b) Impairment of Jackson's interest if intervention is denied*

"To satisfy [the impairment] element of the intervention test, a would-be intervenor must show only that impairment of its substantial legal interest is possible if intervention is denied. This burden is minimal." WildEarth, 573 F.3d at 995 (quotations omitted). "Such impairment or impediment need not be of a strictly legal nature." Coal. of Ariz., 100 F.3d at 844 (quotations omitted). Rather, this court "may consider any significant legal effect in the applicant's interest and [is] not restricted to a rigid res judicata test." Id. (quotations and brackets omitted). "If an absentee would be substantially affected in a practical sense by the determination

---

[2] The dissent's suggested approach—requiring Jackson to await a final judgment in this case and then, perhaps, being subjected to a subsequent suit by SLD—is counter to the notions of efficiency and due process.

19

made in an action, he should, as a general rule, be entitled to intervene." WildEarth, 573 F.3d at 995 (quotations omitted).

Jackson argues that its "legally protectable interest in the Barnes Policy—including its ability to manage the Policy in its economic interest and its potential responsibility for liabilities that arise under or relate to the Policy—may be impaired if [it] is not permitted to intervene." Aplt. Br. at 19. In other words, Jackson argues, "the very foundation for the economic benefits that Jackson obtained in acquiring [from SLD] the block of policies it administers and reinsures are directly threatened by Barnes's Complaint." Id.

Barnes argues, however, that "[b]ecause Jackson has no direct interest at issue in this litigation, Jackson cannot establish that this case sufficiently threatens to impair its interests to warrant intervention." Aple. Br. at 20. Having already concluded that Jackson does indeed have a direct interest at issue in this litigation, we reject Barnes's argument.

Moreover, for essentially the reasons outlined above, we conclude that this case does pose a threat of impairment to Jackson's interests. To begin with, Jackson is responsible for administering the Transferred Policies, including Barnes's Policy, and Barnes's claims directly implicate those administrative duties. Specifically, Barnes's complaint effectively alleges (although it mentions only SLD) that Jackson acted improperly in calculating and deducting certain administrative costs with respect to the Transferred Policies. And, if Barnes were to prevail in this action, that would impact Jackson both monetarily and practically, in terms of having to modify

20

(or at least deciding whether or not to modify) the manner in which it carries out its administrative duties with respect to the Transferred Policies.

Thus, we conclude that Jackson easily satisfies the minimal burden of showing the potential for impairment of its interests.

*c) Will SLD adequately represent Jackson's interest?*

"The remaining requisite for intervention is that [Jackson's] interest not be adequately represented by the existing parties to the litigation." WildEarth, 573 F.3d at 996. Notably, we have also characterized this burden as "minimal." Id. (quotations omitted). "The possibility of divergence need not be great in order to satisfy th[is] burden." Id. (quotations and brackets omitted). "An intervenor need only show the *possibility* of inadequate representation." Id. (brackets and quotations omitted; emphasis in original). Only "when the objective of the applicant for intervention is identical to that of one of the parties" is representation considered to be adequate.[3] Coal. of Ariz., 100 F.3d at 845 (quotations omitted).

The district court concluded "that Jackson's interests are already adequately protected by SLD." Aplt. App., Vol. 2 at 367. In support, the district court noted that "Jackson and SLD have identical interests in the litigation: defending the cost of insurance coverage, as well as the administration of the subject policies, including

---

[3] The dissent suggests that "a concrete showing of inadequacy is necessary." Dissent at 15. But that assumes, incorrectly, that the interests of Jackson and SLD are identical. Quite clearly they are not. Under the express terms of the Second Amended and Restated Indemnity Reinsurance Agreement, only Jackson is responsible for administering the Transferred Policies and, in turn, for discharging any liabilities arising out of errors or improprieties in that administration.

21

the Barnes Policy, from 1984 to present." Id. The district court also noted that "Jackson has a contractual *right* to control this litigation." Id. at 368 (emphasis in original). The district court noted that "[i]f SLD has prevented Jackson from exercising a contractual obligation under the reinsurance and administrative services agreements, Jackson may assert a separate breach of contract claim in an independent action against SLD, or could possibly assert breach of contract as a defense if SLD is ultimately held liable in this litigation." Id.

We conclude that the district court erred in both regards. To begin with, we conclude that the interests of Jackson and SLD are not identical. To be sure, Jackson and SLD are both undoubtedly interested in defending against, and ultimately defeating, the claims asserted in Barnes's complaint. From there, however, their interests clearly diverge. SLD will presumably defend against Barnes's claims, in part, by asserting that it was Jackson, and not SLD, that was responsible for administering the Transferred Policies. Moreover, as Jackson asserts on appeal, "given that the charges and expenses for the two distinct groups of policies implicated here have been managed by different insurers, there is no good reason to assume that Jackson's and SLD's interests and defense strategies will coincide in all respects at every stage in this litigation with respect to what amounts to two different sub-classes of policies." Aplt. Br. at 21. "Differences in their pertinent administrative practices could prompt different factual defenses and strategies, both as to class certification-related arguments and the merits." Id. Further, and relatedly, SLD's counsel cannot be expected to act in the best interests of both SLD and

22

Jackson. Rather, SLD's counsel will, and should, act only in the best interests of its client, SLD. And, indeed, SLD admits as much in its appellate brief, noting that it "has no incentive to reduce liabilities imposed on Jackson for Jackson's unique conduct."[4] SLD Br. at 4. We therefore conclude that Jackson easily satisfies the "minimal" burden of establishing a "possibility" that its interests will not be adequately represented by SLD.

As for Jackson's purported right to control the litigation, SLD correctly notes in its appellate brief that, "[b]ecause of the way Barnes pled his Complaint, there is no simple solution for a single party to control the entire defense of this matter." Id. at 6. Jackson and SLD are each entitled to control the defense of the claims asserted against them: Jackson with respect to the Transferred Policies that it administers, and SLD with respect to the other policies that it administers. Consequently, and understandably, SLD is "unwilling to cede unfettered control of the [entire] litigation to Jackson, because to do so would be to allow Jackson to control the defense of claims for which SLD (and not Jackson) is liable." Id. at 4.

Jackson argues, and correctly so, that the district court erred in concluding that Jackson made "an unsupported allegation that SLD has withheld authorization for Jackson to direct the litigation *because of* a divergence of interests." Aplt. App., Vol. 2 at 368 (emphasis in original). The district court characterized this as a "sweeping,

---

[4] Notably, SLD fully supports Jackson's position regarding intervention and asserts that "the district court erred in denying Jackson's Rule 24 motion to intervene." SLD Br. at 1.

23

unsupported claim[].” Id. As a matter of fact, however, Jackson's assertion is correct. As noted, SLD acknowledges in its appellate brief that it has refused to allow Jackson to control the litigation because SLD believes, and reasonably so, that its own unique interests are at stake, i.e., the fact that SLD was and is responsible for administering a sub-class of the policies at issue.

In sum, we conclude that Jackson has "made the minimal showing necessary to suggest that [SLD]'s representation may be inadequate." Coal. of Ariz., 100 F.3d at 846.

*d) Conclusion*

Because Jackson has satisfied each of the four requirements for intervention as of right under Rule 24(a)(2), we conclude that the district court erred in denying Jackson's motion to intervene.

III

We REVERSE the district court's denial of Jackson's motion to intervene as of right and REMAND with directions to grant that motion.

18-1487, *Barnes v. Security Life*

**HARTZ,** Circuit Judge, dissenting.

The question before this court is whether Jackson is entitled to intervene as of right in litigation by Barnes (and other potential class members) against SLD. Jackson has a contractual duty to indemnify SLD with respect to Barnes's claims based on SLD insurance policies administered by Jackson. In holding that Jackson is entitled to intervene, the majority opinion determines that Jackson has made a sufficient showing that SLD may not adequately represent Jackson's interests regarding claims on those policies. I disagree and respectfully dissent.

I.      Overview

The majority opinion ignores the impact of the law of judgments on the relationship between an indemnitor (such as Jackson) and an indemnitee (such as SLD). I will discuss the law of judgments at some length below. For the present purpose of introducing my dissent, an abbreviated version will suffice. In light of the law of judgments, it would ordinarily be irrational of SLD not to forcefully represent Jackson's interests in the Barnes litigation. This is because if SLD does not adequately represent Jackson's interests, a judgment against SLD in the Barnes litigation will have no preclusive effect against Jackson if SLD seeks indemnification from Jackson. To obtain indemnification, SLD would thus need to prove from scratch in litigation against Jackson that SLD was truly liable to the Barnes plaintiffs with respect to the insurance policies administered by Jackson. The risk is obvious. If SLD does a poor job of defending itself

with respect to the Jackson-administered policies (for which it expects to be indemnified by Jackson), it could find itself stuck with paying the Barnes judgment on its own.

The only circumstance that could justify SLD in not vigorously representing Jackson's interests would be if the two insurers had a true conflict of interest—that is, if SLD could not represent an interest of Jackson without harming its own interests. Yet Jackson does not even articulate such a conflict of interest. All it does is speculate that it and SLD have differed in the way they compute cost-of-insurance expenses for the insurance policies they administer. It does not suggest in any way that for SLD to defend the computations by Jackson, it (SLD) would have to undermine its defense of its own computations. Moreover, Jackson does not even provide any evidence that it and SLD in fact differ in the way they compute cost-of-insurance expenses, despite the fact that it would be easy to obtain that information.

For this court to reverse the district court's denial of intervention as of right on the slim (devoid of evidence) record before us is to read the inadequate-representation requirement out of the rule governing intervention as of right. The majority may believe that it is no big deal to add an additional party whenever that party thinks it is advantageous to join the litigation; but that is not the law. Adding a party necessarily imposes additional burdens on the court and other parties. To do so when there is every reason to expect (and no reason not to expect) that the interests of the party will be well represented in its absence hardly increases the efficiency of the judicial process. That is why the rulemakers included the inadequate-representation requirement. We should respect that decision.

2

The majority opinion relies on the general rule that a movant seeking intervention as of right has a "minimal" burden to show inadequate representation when the movant has interests different from those of any of the existing parties. To begin with, I question whether even that "minimal" standard has been satisfied. Jackson's argument for intervention amounts to a claim that Jackson and SLD may have calculated (and may still be calculating) cost-of-insurance expenses in a different manner from one another and that SLD may not adequately defend Jackson's method of calculation. But Jackson provides no reason to believe that its method of calculation differs from SLD's nor does it explain why they might differ. This is remarkable given how easy it would be for Jackson to show the difference, particularly when SLD is supporting Jackson's motion to intervene (even going so far as to submit a brief in this court). One can only conclude that Jackson has failed to make any effort to determine whether its method of calculation is different from that of SLD. And the obvious inference from that failure is that Jackson's desire to intervene has nothing to do with the possibility of different methods of calculation. Some other motive is at play. Perhaps Jackson's motive for intervention (and SLD's motive for supporting intervention) is simply to enable the two insurers to tag team the Barnes plaintiffs. In the circumstances presented here, I would say that not even the "minimal" standard has been met.

More importantly, however, Jackson has failed to show that it has any interest in the litigation that is not shared by its indemnitee, SLD. It is important to understand what is meant by *interest* in this context. Courts care whether the person moving to intervene and a party to the litigation have different *interests* only if that difference could cause the

3

party not to adequately represent the interests of the movant. The relevant *interest*, therefore, is an interest in proving or disproving something in the litigation. If the movant and a party have identical interests in what ultimately is proved or disproved in the case—that is, they share the same litigation objectives—then it is of no concern to the court whether they have different interests in some other dimension. This meaning of *interests* in the adequate-representation context is of the utmost importance in this case, because, as already mentioned and as will be more fully explained below, an indemnitee has compelling reasons to adopt all the litigation objectives of its indemnitor in litigation against the indemnitee. To do otherwise, is to invite disaster; the indemnitee would risk having a judgment against it for which it could not obtain indemnification from the indemnitor. An indemnitee's failure to adopt the interests of the indemnitor could be justified only if there was a true *conflict* of interest between the indemnitor and indemnitee, not just *differing* interests that the indemnitee could accommodate without sacrificing its own interests. But there is zero evidence of such conflict in this case. Indeed, Jackson does not even allege such a conflict, only a *difference* of interests.

The remainder of this opinion will (1) analyze the relevant interests of Jackson at stake in the Barnes litigation, (2) discuss the relevant law-of-judgments doctrine, (3) summarize the relevant portions of the law governing intervention as of right,[1] and (4) apply the law to the facts of this case.

---

[1]  I do not address permissive intervention. The majority opinion does not suggest that the district court abused its discretion in denying permissive intervention.

## II.   Jackson's Interests in the Barnes Litigation

Barnes's suit alleges that SLD improperly calculated cost-of-insurance expenses, thereby reducing the cash value of life-insurance policies issued to Barnes and putative class members beyond what was contractually authorized.  Barnes and some other putative class members have SLD policies administered by Jackson.  A contract between SLD and Jackson requires Jackson to indemnify SLD for any liabilities arising from Jackson's administration of those policies.  It also provides that Jackson has a right to assume and control the defense of such claims against SLD (which, of course, protects SLD against any claim that it did not adequately defend Jackson's interests in any suit against SLD arising out of those policies).  The other putative class members, however, have SLD policies not administered by Jackson.  This complicates matters because SLD reasonably desires to maintain its own representation to defend claims by those policy owners.  Jackson may be willing to defend those claims as well as the claims based on policies administered by Jackson.  But Jackson would have no skin in the game regarding those policies that it does not administer; if it unsuccessfully defends against claims based on policies it does not administer, it has no duty to indemnify SLD for any judgment against SLD on those policies.  One can understand why SLD would not wish to turn over defense of the claims to someone who has no financial interest in a successful defense of the claims.

On the other hand, leaving the defense of the Barnes litigation solely to SLD could, theoretically, also be problematic. Jackson expresses concern that if SLD controls the defense of all the claims against it under the Barnes litigation, SLD will not

5

adequately represent Jackson's interests with respect to the claims based on policies

administered by Jackson, for which Jackson has a duty to indemnify SLD. (Perhaps

Jackson has not been aware that SLD would have strong incentives to properly represent

Jackson because of the effect of the law of judgments, which is never referenced in its

briefing.)

It is therefore necessary to examine carefully what interests Jackson has in the

Barnes litigation. Before identifying those interests, however, it is necessary to clear a

little smoke from the air. The majority opinion makes an incorrect statement about the

nature of the potential liabilities of Jackson and SLD to the Barnes plaintiffs; and even if

it were true, it would be irrelevant to the intervention issue. The opinion says that "it

appears that Jackson, and not SLD, will bear the responsibility for paying any liability

arising out of the misadministration of the [policies administered by Jackson]." Maj. Op.

at 18–19. I read this as saying that SLD would not be liable to the plaintiffs for

miscalculating the cost-of-insurance expenses but that Jackson could be held liable. This

is incorrect. The opinion relies on a contract provision between Jackson and SLD stating

that Jackson "agrees to assume and discharge one hundred percent (100%) of all Extra

Contractual Obligations." Aplt. App., Vol. I at 242. But the Barnes complaint is not

based on any *extracontractual* obligations. It alleges only violations of SLD's contracts

with the plaintiffs.[2] So the above-quoted language of the contract between Jackson and

---

[2] Barnes's complaint also contains a conversion claim. But the claim is essentially the
same as the contract claim; it alleges only that SLD took funds that, under the insurance
contracts, belong to the insureds.

6

SLD does not even apply on its face. In addition, the plaintiffs entered into contracts with SLD, not Jackson. If the contracts were, as alleged in the Barnes complaint, administered in violation of the contract, liability lies with the contractual partner of the plaintiffs, which is SLD, not Jackson. Further, I do not see how a contract between Jackson and SLD could relieve SLD of its contractual obligations (or any other obligations for that matter) to policyholders.

In any event, even if the statement in the majority opinion were true, it would not present a reason why Jackson should be allowed to, or even want to, intervene. If the Barnes court determined that liability rests with Jackson rather than SLD, Jackson would have nothing to fear. In that circumstance, SLD would be exonerated and would not be seeking any indemnification from Jackson. And the determination that liability lies with Jackson could have no effect on Jackson. The majority opinion does not explain how liability could be imposed directly on Jackson when it is not a defendant in the Barnes litigation. Thus, Jackson (if it is not permitted to intervene) would hardly suffer if the Barnes litigation determines that it is Jackson, rather than SLD, that is liable to the plaintiffs. The fact that Jackson, rather than SLD, might be the insurer liable to the Barnes plaintiffs would not be a reason for Jackson to wish to intervene; on the contrary, it would be a reason for Jackson to stay out of the litigation to avoid an adverse judgment against it.

Now to Jackson's actual interests. As I understand the briefs, Jackson has expressed concerns about two possible rulings against SLD. The first is that Barnes will obtain a judgment that SLD has miscomputed the cash value of the class members' insurance policies by deducting too much in cost-of-insurance expenses over the years. (I suspect that for many, perhaps most, policyholders the judgment will require nothing more than changes in bookkeeping entries.[3]) Jackson apparently assumes that if such a judgment is entered against SLD, it will be required to indemnify SLD for any loss sustained on the policies that Jackson administered.

The second possible ruling that Jackson is worried about is a declaratory judgment and injunction requiring a change for the future in how the cost-of-insurance expenses are calculated. As far as I can tell, this is essentially the same claim as the one for past excessive deductions for cost-of-insurance expenses; it just requires that the corrective actions be continued in future years. Although Jackson characterizes such a judgment as affecting its administration of the policies, the judgment would not, for example, tell Jackson what its hiring or compensation practices would have to be. The plaintiffs have no particular interest in the administrative practices of SLD (or Jackson). They are interested in the bottom line—money, the cash value of their policies. The first paragraph of the Barnes complaint states that it is "a class action for breach of contract

_____

[3] There will, however, be occasions on which the cash-value entry has already had financial consequences. For example, (1) if the policyholder died, the beneficiaries should have received the policy death benefit plus the cash value of the policy; and (2) if the cash value has disappeared because of deductions for improper expenses, the policyholder may have had to make premium payments that should have come out of the cash value.

and conversion *to recover amounts* that [SLD] charged [Barnes] and the proposed class in excess of the amounts authorized by the express terms of their life insurance policies." Aplt. App. at 11 (emphasis added). The judgment would be purely financial in nature, simply ordering that certain expenses not be deducted from the cash value of the policies in the future. A Barnes judgment could require *SLD* to credit the insured with a greater policy cash value. But it could not in itself require *Jackson*, who is not a party, to do anything. In particular, it could not require Jackson to pay out any more money than it believes is due or even to change its bookkeeping practices. And SLD could not compel Jackson to do anything different without either showing that Jackson is bound by the Barnes judgment or proving in litigation against Jackson that the judgment against SLD was correct.[4]

In short, Jackson's only interest in the Barnes litigation is in its capacity as an indemnitor of SLD. Its concern is that if judgment is entered against SLD, requiring SLD to credit and pay money to the Barnes plaintiffs, SLD will make Jackson assume the duty to credit and pay that money to the plaintiffs. Although the majority opinion insists that Jackson has an interest as an *administrator*, not just as an *indemnitor*, the opinion does not identify anything that a Barnes judgment could ultimately compel Jackson to do except credit and pay money. Moreover, the opinion does not explain why the label for

---

[4] The majority opinion interprets the agreement between SLD and Jackson as permitting Jackson to compute the cost-of-insurance expenses without obtaining approval from SLD.

9

Jackson's duties (administrator, as opposed to indemnitor) makes any difference in the analysis of the ultimate issue—whether SLD (because of the law of judgments) has the same litigation objectives as Jackson and is therefore presumed to adequately represent Jackson's interests.

Hence it is necessary to examine the effects on Jackson of a potential judgment against SLD in the Barnes litigation. This is a matter addressed by the law of judgments.

### III. Indemnitees Under the Law of Judgments

The Restatement (Second) of Judgments (the Restatement) § 57 (1982), entitled "Effect on Indemnitor of Judgment Against Indemnitee," addresses when an indemnitor (such as Jackson) is bound by a judgment against the indemnitee (such as SLD). (Section 58, which addresses the same issue when the indemnitor has an independent duty to defend the indemnitee, is not applicable here.) As it turns out, § 57 provides Jackson with the protection it seeks in this case—it cannot be bound as an indemnitor to SLD unless either (1) SLD adequately represents Jackson's interests in the Barnes litigation or (2) it has an opportunity to defend against the Barnes allegations (by challenging those allegations in a separate suit against it by SLD for indemnification). The blackletter of § 57 states in full:

> (1) Except as stated in Subsection (2), when one person (the indemnitor) has an obligation to indemnify another (the indemnitee) for a liability of the indemnitee to a third person, and an action is brought by the injured person against the indemnitee and the indemnitor is given reasonable notice of the action and an opportunity to assume or participate in its defense, a judgment for the injured person has the following effects on the indemnitor in a subsequent action by the indemnitee for indemnification:

10

(a) *The indemnitor is estopped* from disputing the existence and extent of the indemnitee's liability to the injured person; *and*

(b) *The indemnitor is precluded* from relitigating issues determined in the action against the indemnitee *if*:

> (i) the indemnitor defended the action against the indemnitee; or
> (ii) *the indemnitee defended the action with due diligence and reasonable prudence.*

(2) If there is a conflict of interest between the indemnitee and the indemnitor regarding the injured person's claim against the indemnitee, so that the indemnitor could not properly have assumed the defense of the indemnitee, *a judgment for the injured person precludes the indemnitor only with respect to issues determined in that action as to which*:

> (a) *there was no conflict of interest between the indemnitee and the indemnitor; and*
> (b) *the indemnitee conducted a defense with due diligence and reasonable prudence.*

(3) A "conflict of interest" for purposes of this Section exists when the injured person's claim against the indemnitee is such that it could be sustained on different grounds, one of which is within the scope of the indemnitor's obligation to indemnify and another of which is not.

(emphasis added).

Thus, if SLD defends the suit brought against it by Barnes, then Jackson may be "estopped from disputing the existence and extent of [Jackson's] liability to [the Barnes plaintiffs]" and may be "precluded from relitigating issues determined in the action against [SLD]," but *only if* SLD "defended the [Barnes] action with due diligence and reasonable prudence." Restatement § 57. (If SLD does not adequately defend Jackson's interests, it could still obtain indemnification from Jackson, but it would have to prove from scratch that it was liable to Barnes in the amount of the judgment.) Also, if there is a conflict of interest between Jackson and SLD regarding the Barnes claims against SLD,

11

then Jackson can be bound "only with respect to issues determined in [the Barnes litigation] as to which . . . there was no conflict of interest between [SLD] and [Jackson]."

The comments to this Restatement section express the rule in terms of adequate representation. Comment a to § 57 explains, "[I]f the indemnitor does not assume control of the defense, he can be bound by the determinations in the action only to the extent the indemnitee can be said to have *adequately represented him* in defending the action." (emphasis added). Comment c addresses conflicts of interest: "Accordingly, when the claim against the indemnitee is one as to which he and the indemnitor have a conflict of interest, the indemnitor is not estopped in a subsequent action on the indemnity obligation to dispute the existence or extent of the indemnitee's liability to the injured person." Later the comment explains:

> When, because of conflict of interest between the indemnitee and indemnitor, the indemnitor cannot properly take over the defense of the indemnitee, the situation is one of a justified refusal by the indemnitor to defend the action. If the indemnitee defaults or otherwise does not conduct a reasonably proper defense of the action, the judgment has no effects on the indemnitor because it cannot be said that the indemnitee *adequately represented him*.

(emphasis added).

In other words, if SLD has a conflict of interest with Jackson or otherwise does not adequately represent Jackson's interests in the Barnes litigation, then Jackson is not bound by a judgment in the Barnes litigation as far as its indemnification of SLD is concerned.

Given this law, it is apparent that a defendant-indemnitee has powerful reasons for vigorously representing the interests of the indemnitor when it is sued if it wishes

12

ultimately to be indemnified by the indemnitor. If the defendant adequately defends the plaintiff's claims against it but nevertheless loses, the indemnitor cannot later challenge the existence and extent of the defendant's liability to the plaintiff. To obtain indemnification, the defendant need only show that the indemnification contract encompasses the liability incurred. If, on the other hand, the defendant does not adequately defend the plaintiff's claim, it can be whipsawed. It will be liable on the judgment obtained by the plaintiff against it; but in seeking indemnification from the indemnitor, it will need to prove its own case that it was in fact liable to the plaintiff. It faces the possibility that the plaintiff will succeed in proving liability against it but that it will fail to prove its own liability in seeking indemnification against the indemnitor. To avoid this whipsaw, the indemnitee will, absent special circumstances, align its interests with those of its indemnitor.

## IV. Intervention/Adequate Representation

Fed. R. Civ. P. 24(a) governs whether a movant is entitled to intervene as of right in ongoing litigation. The movant must make certain showings. Among them is that its interests will not be adequately represented by existing parties. *See* Fed. R. Civ. P. 24(a)(2); *Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regulatory Comm'n*, 578 F.2d 1341, 1345 (10th Cir. 1978) (burden is on movant to show inadequate representation). The Supreme Court and this court have said that this is a minimal burden of showing that the representation of its interests "may be" inadequate. *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972) (citing 3B J. Moore, Federal Practice 24.09—1 [4] (1969)); *Nat. Res. Def. Council*, 578 F.2d at 1345. But the requirement "may not be

13

ignored entirely." 6 James Wm. Moore et al., *Moore's Federal Practice* § 24.03[4][a] (3d ed. 2011) ("For example, a difference between the existing parties and the movants to intervene as to the motives for litigation does not establish inadequacy of representation in the litigation."); *see Kane Cty., Utah v. United States*, 928 F.3d 877, 892 (10th Cir. 2019) ("[R]epresentation is not inadequate simply because the applicant and the representative disagree regarding the facts or law of the case." (internal quotation marks omitted)). After the Civil Rules Committee liberalized the standard for intervention as of right in 1966, the summary of the revisions by the Reporter for the Committee spoke in terms of "thrash[ing] out" whether representation would be adequate in the particular case. Benjamin Kaplan, *Continuing Work of the Civil Committee*: *1966 Amendments of the Federal Rules of Civil Procedure* (I), 81 Harv. L. Rev. 356, 402 (1967). *Thrashing out*, I would think, requires a more vigorous examination by the court than mere passive acceptance of assertions unsupported by concrete evidence.

The movant's burden cannot be satisfied by mere speculation. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 807 F.3d 472, 475 (1st Cir. 2015) (the potential intervenors—a group of current and prospective Harvard students—had to produce "something more than speculation as to the purported inadequacy of representation" by Harvard College in a suit challenging the college's consideration of race in admissions decisions, and the students failed to meet this minimal burden because they had adopted "four-square" Harvard's goal of defending its admission policies (internal quotation marks omitted)).

14

The burden of showing the likelihood of inadequacy of representation is particularly important when, as in this case, a party and the prospective intervenor have the same objectives. In that circumstance, we require more than a showing that representation *may* be inadequate; a concrete showing of inadequacy is necessary. *See, e.g.*, *Tri-State Generation & Transmission Ass'n, Inc. v. New Mexico Pub. Regulation Comm'n*, 787 F.3d 1068, 1072–73 (10th Cir. 2015) (applying a presumption of adequate representation, which can be overcome only by a "concrete showing," when the prospective intervenor, a member of the plaintiff regional electric distribution cooperative, shared the same litigation objective as the government defendant: preserving the defendant's jurisdiction over the cooperatives' wholesale electricity rates); *City of Stilwell, Okl. v. Ozarks Rural Elec. Co-op. Corp.*, 79 F.3d 1038, 1042–43 (10th Cir. 1996) (requiring a cooperative that supplies electric power to member distributors to make a concrete showing of inadequate representation by its member in order to intervene in a condemnation action brought against the member by the city); *Bottoms v. Dresser Indus., Inc.*, 797 F.2d 869, 872 (10th Cir. 1986) (applying a presumption of adequate representation where the prospective intervenor, although claiming that the plaintiff owed him a 50% interest in a patent, nonetheless shared the plaintiff's goal of obtaining the greatest possible recovery for defendant's alleged breach of the patent licensing agreement). Other circuits agree. *See, e.g, Stuart v. Huff*, 706 F.3d 345, 350–52 (4th Cir. 2013) (applying a presumption of adequate representation, which could be overcome only by a strong showing, because the government agency in the suit and the would-be intervenors both sought to have an abortion-related statute upheld as

15

constitutional); *Maine v. Dir., U.S. Fish & Wildlife Serv.*, 262 F.3d 13, 19 (1st Cir. 2001) (employing an "assumption, subject to evidence to the contrary," that federal agencies would adequately defend their designation of an endangered species against a challenge brought by Maine and several business groups; district court did not abuse its discretion in concluding that proposed intervenors did not give adequate explanation of why their interests would not be adequately represented); *United States v. Hooker Chems. & Plastics*, 749 F.2d 968, 984–90 (2d Cir. 1975) (environmental groups had to make a strong affirmative showing of inadequate representation by the United States government in order to intervene in the government's action against a chemical-and-plastics corporation for illegal disposal of chemical waste).

## V.      Resolution of this Dispute

Applying the above legal principles to the present case, I do not see how one could say that Jackson has made an acceptable showing that SLD would not adequately represent its interests in the Barnes litigation. To begin with, SLD has all the litigation objectives that Jackson would have. Because of the law of judgments, it will be in the interest of SLD to prove everything Jackson would want to prove and to disapprove everything Jackson would want to disapprove. As is true for any defendant-indemnitee, SLD has a compelling incentive to vigorously defend claims for which it may seek indemnification. It is very much in SLD's interest to avoid any challenge by Jackson that it has not adequately represented Jackson's interests, because a successful challenge could defeat an indemnification claim against Jackson. SLD would hardly want to be in the position of having to prove (in an indemnification suit against it by Jackson) that it

16

was liable to Barnes on the Jackson policies in order to obtain indemnification from Jackson. Given this shared litigation objective, our precedents presume that SLD will adequately represent Jackson's interests, yet Jackson has presented no concrete evidence to overcome the presumption. To be sure, as pointed out by the majority opinion, SLD's brief on appeal asserts that it "has no incentive to reduce liabilities imposed on Jackson for Jackson's unique conduct." SLD Br. at 5. But SLD never made that remarkable assertion before the district court denied intervention; and the assertion could hardly have withstood cross-examination based on the law of judgments.

This is not to say that there are no occasions in which a defendant-indemnitee could rationally decide to forgo arguments or evidence that could defeat the indemnified claim. For example, the arguments or evidence might undermine the defense of a claim that would not be covered by an indemnification agreement. If the indemnification is only for negligence, and not for willful misconduct, the indemnitee could rationally decide not to argue its own willfulness, even though proof of willfulness would be quite helpful to the indemnitor.

In this case, however, there is no reason to think that a defense of Jackson's calculations of cost-of-insurance expenses would contradict or undermine SLD's defense of its own calculations of those expenses. It would be quite easy for Jackson to compare notes with SLD (which supports Jackson's intervention) to determine whether their calculations are *inconsistent* with one another. (It would not be enough that the two companies simply have different ways of calculating cost-of-insurance expenses. The question is whether defending Jackson's calculations would make it harder to defend

17

SLD's). Yet Jackson has not even gone so far as to assert that there are such contradictions, much less provide supporting evidence. (Nor, for that matter, has SLD.) In fact, Jackson has even questioned whether the calculations by Jackson and SLD differed in any respect. *See* Aplt. Reply Br. at 10 ("Barnes . . . fails even to allege that [cost-of-insurance] rates were ever changed [after Jackson assumed administration of SLD policies].").

With absolutely no evidence to the contrary, it appears that the interests of SLD and Jackson in prevailing against Barnes on the Jackson policies are fully congruent. Hence, Jackson must make a strong showing that SLD will not represent its interests. This case fits well within the precedents holding that a movant with the same litigation objectives as a party has not made an acceptable showing that its interests will not be adequately represented. It would be offensive to the adequate-representation requirement of Fed. R. Civ. P. 24(a) to permit Jackson to intervene when it has not attempted even the easily-made showing that it has departed from SLD's prior method of calculating cost-of-insurance expenses, much less provided evidence of divergent litigation objectives.

It is important to keep in mind that Jackson's interest in intervention is not of great moment. To an extent, Jackson would be better off if it did not intervene. Nonintervention would give it two bites at the apple. First, SLD may successfully defend the Barnes lawsuit. In that event, Jackson has no exposure. Second, if SLD is held liable with respect to the Jackson policies, Jackson can argue against indemnification on the grounds that SLD did not adequately represent its interests and that Barnes's claims with respect to the Jackson policies are not meritorious. Perhaps this is why there appear to be

18

no federal-court decisions holding that an indemnitor is entitled to intervene as of right as a party to dispute the plaintiff's claims against the indemnitee. Neither Jackson nor the majority opinion cite any such cases, nor am I aware of any.

Barnes argues that the real reason why Jackson and SLD want Jackson to intervene is so that they can double-team Barnes. I have no opinion on that allegation. But the very possibility of improper motives should make us cautious about ignoring the requirements of Rule 24(a).

I would affirm the decision of the district court denying intervention. The affirmance would, however, be without prejudice to allowing intervention if evidence of a true conflict of interest were later shown.